Filed 4/3/14  P. v. Granado CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GARY DEL GRANADO,<br><br>Defendant and Appellant. | F065908<br><br>(Super. Ct. No. MCR041744)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Mitchell C. Rigby, Judge.

Peter Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Jesse Witt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In this Three Strikes case, defendant Gary Del Granado received a sentence of 25 years to life after being convicted of possessing methamphetamine with four prior strike convictions.  He now argues:  (1) statements were obtained from him in violation of *Miranda v. Arizona* (1966) 384  U.S. 436 (*Miranda*); (2) the prosecutor committed misconduct in his questioning of a defense witness; (3) the trial court abused its discretion in allowing a 20-year-old domestic battery conviction to be used to impeach a defense witness; (4) the jury instructions and verdict forms used for finding the prior strike allegations to be true were erroneous; and (5) the matter should be remanded for resentencing under the Three Strikes Reform Act of 2012 (Proposition 36), which became effective after Granado was sentenced.  We affirm.

## FACTS AND PROCEDURAL HISTORY

Around 11:00 p.m. on August 22, 2011, a Ms. Garcia called the Madera Police Department to say a man was refusing to leave her home.  Officers Alva and Tuckness were dispatched to Garcia's house.  Granado, who matched a description given by Garcia, was sitting in a minivan parked in front of the house.  Officer Alva parked, got out, and walked over to Granado.  Granado was moving around inside the minivan, and Alva asked him to step out to talk.  He stepped out and Alva asked what he was doing there.  Granado said he was visiting his ex-girlfriend to bring her a box of earrings.  Alva observed that Granado was fidgety, spoke very quickly and did not make eye contact.  When Granado spoke, Alva smelled a chemical odor she had often noticed during drug arrests and that she associated with methamphetamine.  She suspected he was under the influence of drugs.  She shined a flashlight in his eyes and observed eyelid tremors and rebounding pupils, symptoms that confirmed her suspicion.  Alva asked whether he had used drugs recently, and Granado said he had smoked methamphetamine a few hours earlier.  Then she asked whether he had any drugs or weapons.  He said no and consented to a search of his person.  The search turned up nothing.  Alva did not arrest or handcuff Granado, but asked him to sit on the curb while she went to the house to speak to Garcia.

2.

Garcia told Alva she wanted Granado to leave. Alva went back to Granado, said she would not allow him to drive in his condition and asked if there was someone he could call to come drive him home. Granado said he would call someone. Alva asked him whether there was anything illegal in the van. Granado said no and told Alva she could check. As Alva was getting ready to do so, Garcia insisted that the van be moved off the property. Granado gave his permission to Officer Tuckness to drive the van out of the driveway.

After moving the van onto the street, Tuckness told Alva there was something of interest on the van's passenger seat. Alva asked Granado if he had anything to say about that. Granado became agitated, rocking and clenching his fists. Alva handcuffed him and they walked to the van together. On the seat was a small yellow plastic bag tied in a knot. Granado then declared that it was not his van and that Alva had not seen him driving it. From the packaging and the feel of the contents through the bag, Alva believed methamphetamine was inside. She opened the bag and found small crystals, which were later determined to be 0.1 grams of methamphetamine. Alva placed Granado under arrest.

The district attorney filed an information charging Granado with one felony count of methamphetamine possession. (Health & Saf. Code, § 11377, subd. (a).) The information also alleged that Granado had five prior strike convictions: one burglary (Pen. Code, § 459)[1] in 1988; three rapes in 1993 of a person incapable of giving legal consent because of a mental disorder or a developmental or physical disability (§ 261, subd. (a)(1)); and an assault in 1998 with intent to commit mayhem, rape, sodomy, oral copulation or another specified offense (§ 220). The burglary allegation was later stricken at the request of the prosecution because the offense was committed when Granado was a juvenile and was not an offense eligible to be treated as a juvenile strike.

---

[1]     Subsequent statutory references are to the Penal Code unless noted otherwise.

At trial, Granado's defense was that the methamphetamine belonged to his father, Raymond Granado. Raymond testified that on the night of the arrest, he bought a yellow plastic bag of methamphetamine for $10. He planned to sprinkle the methamphetamine in coffee later in the evening to give him energy to pick up cans. He put the bag in the shirt pocket where he kept his cigarettes. Around 9:00 or 10:00 p.m., he walked to his son's trailer. When he got there, he asked his son for a ride to a store to buy the coffee. They drove there in the brown van. After his son dropped him off at the store, he realized the methamphetamine was missing. He concluded it must have fallen out of his pocket inside the van when he got the cigarettes out. His son had driven off and did not have a phone. Raymond found out about the arrest the next day.

For purposes of impeachment, the jury was presented with a stipulation that Raymond was convicted in 1992 on a felony charge of violating section 273.5, willful infliction of corporal injury on a spouse or cohabitant.

The jury found Granado guilty as charged. It also found true the four allegations of prior strike convictions.

At the sentencing hearing, Granado made a motion to strike all but one of the prior strikes and impose a determinate term. The People opposed the motion, saying that although the present case involved possession of only a small amount of drugs, Granado's history of recidivism meant his case was within the spirit of the Three Strikes Law. The prosecutor described the three section 261 convictions as forcible rapes of Granado's disabled cousin. She also mentioned Granado's six parole violations. The court described the section 220 violation as an assault with intent to commit rape. In his comments to the court, Granado stated that the parole violations arose from visits to his father's house. The rape victim lived with his father, so he was forbidden to go there.

The court denied the motion and imposed a sentence of 25 years to life.

4.

## *DISCUSSION*

### I.    *Miranda*

Granado made a motion in limine to exclude the statement he made to the police before he was arrested that he had used methamphetamine a few hours earlier.  He contended that the conversation with Officer Alva in which he made this statement was a custodial interrogation before which he was not advised of his rights, so admission of the statement would violate the *Miranda* rule.  The court denied the motion and Granado renews the argument now.[2]

When reviewing a *Miranda* ruling, we accept the facts as found by the trial court if supported by substantial evidence and we review independently the question of whether, in light of those facts, the statement at issue was obtained in violation of the *Miranda* rule.  (*People v. Wash* (1993) 6 Cal.4th 215, 235-236; *People v. Ochoa* (1998) 19 Cal.4th 353, 402.)

The question in this case is whether Granado was in custody when Alva asked whether he had used drugs recently.  *Miranda* warnings are required only for custodial interrogations, not for every instance of police questioning.  (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495; *People v. Ochoa*, *supra*, 19 Cal.4th at p. 401.)  A suspect is in custody if a reasonable person under the circumstances would believe his or her freedom of movement is restrained to the same extent as in a formal arrest.  (*California v. Beheler* (1983) 463 U.S. 1121, 1125.)

---

[2]    In his appellate brief, Granado claims his statements that the van was not his and the police had not seen him drive it also should have been excluded.  Granado was handcuffed at the time he made those statements, but in the trial court, defense counsel orally conceded that the statements were admissible under *Miranda* because they were spontaneous.  Granado points out that his written motion requested exclusion of all statements he made before being Mirandized, but we do not see how this would preserve the issue when he expressly disclaimed any intent to challenge the admission of the statements about the van in open court afterwards.  Consequently, the *Miranda* issue has not been preserved for appellate review with respect to those statements and we will not consider them further.  (*People v. Gurule* (2002) 28 Cal.4th 557, 602.)

The Supreme Court has held that questioning during a typical traffic stop or a detention like the one at issue in *Terry v. Ohio* (1968) 392 U.S. 1—that is, a brief detention for the purpose of investigating an officer's reasonable suspicion of criminal wrongdoing—is not a custodial interrogation:

> "[T]he usual traffic stop is more analogous to a so-called '*Terry* stop,' see [*Terry v. Ohio*, *supra*, 392 U.S. 1], than to a formal arrest. Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.' [Citation.] '[The] stop and inquiry must be "reasonably related in scope to the justification for their initiation."' [Citations.] Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." (*Berkemer v. McCarty* (1984) 468 U.S. 420, 439-440, fns. omitted.)

Officer Alva's actions were indistinguishable from a *Terry* stop or a typical traffic stop. Having been dispatched on a report of a man refusing to leave a house, she found Granado, a man matching the description given, in a car outside the house. She did not yet have probable cause to arrest him, but she had reasonable suspicion supporting a brief detention for questioning. Her observations during this detention justified the question that led to the incriminating statement, a question she asked only a few minutes after the detention began. She did not draw her gun, use her car's siren or flashing lights, or tell Granado he was under arrest. Her testimony was that she asked Granado to get out of the van to talk, not that she ordered him out. Before finding the methamphetamine, Alva made it clear she was prepared to release Granado if someone would come to drive him

home.  We conclude that a reasonable person in this situation would not believe his freedom of movement was restrained to the same degree as it would have been in an arrest.

Granado emphasizes the facts that Alva arrived in a marked car and was armed and in uniform and that Officer Tuckness had also arrived in another marked car.  A *Terry* stop and a typical traffic stop, however, are ordinarily carried out by uniformed, armed officers and officers in police cars.  This alone is not a sufficient show of authority to render a detention equivalent to an arrest.

Granado also stresses that he was told to sit on the curb at one point, that the conversation was dominated by the officer, that it was apparent during the questioning that Granado was a potential suspect, and that he was arrested shortly after making the statement at issue.  We agree that these are factors supporting Granado's view, but they are outweighed by the other factors we have discussed.  For all of the above reasons, we conclude that the brief detention and questioning leading to Granado's admission that he had used methamphetamine were not a custodial interrogation.

## II.     *Prosecutorial misconduct*

The prosecutor questioned Raymond Granado about the source of the methamphetamine he claimed was his.  Raymond declined to name the seller:

> "Q      And where did you get it from?
>
> "A      I got it from a person that had some, but I can't tell you who it was.
>
> "Q      Why not?
>
> "A      I just can't.
>
> "Q      Why not?
>
> "A      Huh?
>
> "Q      Why not?

"A    I don't know.  I just can't tell you who it was."

Defense counsel did not make an objection.  Later, the prosecutor asked whether Raymond had ever bought drugs from the same seller on other occasions.  Defense counsel made a relevance objection, which was overruled.  Raymond said no.

In his closing argument, the prosecutor contended that these answers showed that Raymond lacked credibility:

> "What was his attitude toward testifying, right?  He's willing to put himself in jeopardy to get his son out of trouble, but he's not willing to tell us who he purchased the drugs from, which seems like it may make sense, but if that's the person—if that's what you need to do, if that's what you're really committed to testifying about, to, as he says, do the right thing and get your son out of something that he didn't do, why not give us that answer?"

Defense counsel did not object to the argument.

Granado now argues that the prosecutor's questions and argument on this topic constituted misconduct because the question from whom Raymond bought the methamphetamine was not relevant to Granado's guilt.  He says the prosecutor's actions unfairly damaged Raymond's credibility and "only served to 'smear' [Raymond] by emphasizing the sinister nature of his drug dealing."

Granado's claims about the first question—who the seller was—and the closing argument are forfeited because no objection was made in the trial court.  (*People v. Brown* (2003) 31 Cal.4th 518, 553 ["To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury."].)

This leaves the claim about the question whether Raymond had ever bought drugs from the same seller before.  The only objection made to this question was a relevance objection.  There was no claim of prosecutorial misconduct and no request for an admonition to the jury.  It has been held that a relevance objection does not preserve for appeal a claim that evidence should have been excluded as unduly prejudicial under

Evidence Code section 352. (*People v. Alexander* (2010) 49 Cal.4th 846, 905.) The same principle applies here. Granado did not preserve a claim that the question was an unfair inflammatory attack on the witness's credibility by making a relevance objection. This claim, therefore, is forfeited as well.

Even if the claims had been preserved, we would not find reversible error. Our Supreme Court set forth the federal and state standards for prosecutorial misconduct in *People v. Samayoa* (1997) 15 Cal.4th 795, 841:

> """A prosecutor's … intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to persuade either the court or the jury.'"" [Citation.] … Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]"

The questions and argument at issue here were not of this nature. At the very least, there is a colorable claim that asking Raymond to add these details to his story was a legitimate method of cross-examination. If the story were true, he would have the details ready at hand; if not, he might stumble and hesitate. The jury could draw legitimate inferences from his demeanor either way. The questions and argument at issue, therefore, did not rise to the level of misconduct even if it was error to allow them.

## III. *Impeachment*

Granado asserts that the court should not have permitted the use of Raymond's 1992 felony violation of section 273.5 for impeachment. He says the conviction was too old and had little probative value on the issue of Raymond's credibility.

A witness's prior felony offenses of moral turpitude are admissible to impeach the witness's credibility. The trial court must apply Evidence Code section 352 and determine whether the probative value of the impeachment is substantially outweighed by

9.

its prejudicial effect. We review for abuse of discretion the trial court's decision to admit evidence of a witness's prior offenses for impeachment. (*People v. Clark* (2011) 52 Cal.4th 856, 931-932; Evid. Code, § 788.)

The degree to which the prior offense reflects the witness's dishonesty, the age of the prior conviction and the witness's record of criminal conduct in the interim are among the factors to be considered. (*People v. Clark*, *supra*, 52 Cal.4th at p. 931; *People v. Burns* (1987) 189 Cal.App.3d 734, 738; *People v. Beagle* (1972) 6 Cal.3d 441, 453.) Although all crimes of moral turpitude are relevant for purposes of impeachment, it has been held that a crime involving dishonesty, such as larceny, is more probative of credibility than a crime involving violence, such as battery. (*People v. Burns*, *supra*, at p. 738.)

We have no doubt that a violation of section 273.5 is sufficiently probative on the issue of credibility. The willful infliction of corporal injury on a spouse, cohabitant, person with whom the offender is in a dating relationship, or parent of the offender's child, has a special status among crimes of violence:

> "To violate Penal Code section 273.5 the assailant must, at the very least, have set out, successfully, to injure a person of the opposite sex in a special relationship for which society rationally demands, and the victim may reasonably expect, stability and safety, and in which the victim, for these reasons among others, may be especially vulnerable. To have joined in, and thus necessarily to be aware of, that special relationship, and then to violate it willfully with intent to injure, necessarily connotes the general readiness to do evil that has been held to define moral turpitude." (*People v. Rodriguez* (1992) 5 Cal.App.4th 1398, 1402.)

The 20-year period between the offense and the trial was not so long as to undermine the conviction's probative value in this case because Raymond committed numerous offenses in the interim. The felony section 273.5 conviction took place on September 14, 1992, when Raymond was 43 years old. He was convicted of a misdemeanor weapon possession offense in 1992 (former § 12021); falsely identifying

10.

himself to a police officer in 1992 and again in 1994 (§ 148.9); resisting arrest in 1997 (§ 148); a misdemeanor section 273.5 violation in 1997; failure to appear on a DUI charge in 2000; a misdemeanor assault with a deadly weapon in 2002 (§ 245); driving with a suspended or revoked license in 2004 (Veh. Code, § 14601); and removing a shopping or laundry cart in 2008 (Bus. & Prof. Code, § 22435.2). These were not all serious offenses, but they certainly show that Raymond did not lead "'a legally blameless life'" (*People v. Beagle*, *supra*, 6 Cal.3d at p. 453) after committing the felony of moral turpitude. The trial court did not abuse its discretion.

## IV. *Instructions and forms for prior strike findings*

The question of whether Granado had sustained the four alleged prior strikes was tried to the jury. The jury was provided with four verdict forms relating to the prior strikes. Three of these pertained to the section 261 priors. The first gave the jury the option of finding it true or not true that Granado committed one violation of section 261. The second permitted the jury to find it true or not true that he committed two such violations, and the third allowed the jury to find it true or not true that he committed three. The foreperson circled "true" on the last of these forms and signed it. The fourth form permitted the jury to find it true or not true that Granado committed the prior section 220 offense. The foreperson circled "true" and signed the form.

In accordance with CALCRIM Nos. 3101 and 221, the jury was instructed:

> "The People have alleged that the defendant was previously convicted of other crimes. It has already been determined that the defendant is the person named in the exhibit, Exhibit 4 [i.e., the record of Granado's prior convictions provided by the Department of Corrections and Rehabilitation]. You must decide whether the evidence proves that the defendant was convicted of the alleged crimes. The People allege that the defendant has been convicted of:

> "2, a violation of Penal Code Section 261, subdivision (a), subdivision (1) [*sic*], on August 30, 1993, in the Superior Court of California, County of Madera, case number 11286.

11.

"3, a violation of Penal Code Section 261, subdivision (a), subdivision (1) [*sic*], on August 30, 1993, in the Superior Court of California, County of Madera, case number 11286.

"4, a violation of Penal Code section 261, subdivision (a), subdivision (1) [*sic*], on August 30, 1993, in the Superior Court of California, County of Madera, case number 11286.

"5, a violation of Penal Code Section 220 on September 15, 1998, in the Superior Court of California, County of Madera, case number 14608.

"In deciding whether the People have proved the allegations, consider only the evidence presented in this proceeding. Do not consider your verdict or any evidence from the earlier part of the trial. You may not return a finding that any alleged conviction has or has not been proved unless all 12 of you agree on that finding.

"The People are required to prove the allegations beyond a reasonable doubt. Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the allegation is true. The evidence does not need to eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt.

"In deciding whether the People have proved an allegation beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received during this phase of the trial. Unless the evidence proves an allegation beyond a reasonable doubt, you must find that the allegation has not been proved."

Granado argues that the instructions were erroneous because they did not state that the jury must make a separate determination of the truth of each of the three convictions under section 261. He maintains that the court ought to have crafted an instruction analogous to CALCRIM No. 3515, which is applicable to the current charged offenses in a case and states that multiple counts must be considered separately.

Granado did not request an instruction of this kind in the trial court. Even CALCRIM No. 3515 is not required to be given on the court's own motion. (*People v. Beagle*, *supra*, 6 Cal.3d at p. 456 [court not required to give equivalent CALJIC

12.

instruction sua sponte].)  The trial court could not have been expected to impose such a requirement on itself, and the issue therefore is forfeited.

Granado argues that if the issue is forfeited by trial counsel's failure to request the instruction, then trial counsel rendered ineffective assistance.

To establish ineffective assistance of counsel, defendant must show that counsel's performance "fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694; see also *People v. Hester* (2000) 22 Cal.4th 290, 296.)  It is not necessary to determine whether counsel's challenged action was professionally unreasonable in every case, however.  If the reviewing court can resolve the ineffective assistance claim by proceeding directly to the issue of prejudice—i.e., the issue of whether there is a reasonable probability that the outcome would have been different absent counsel's challenged actions or omissions—it may do so.  (*Strickland v. Washington*, *supra*, at p. 697.)

There is no reasonable probability that Granado would have obtained a better outcome if an instruction of the kind he contemplates had been given.  The jury was simply presented with a record of the judgment showing the three section 261 convictions.  There was no rational way in which the jury could have found some of the convictions true and others not true.

Granado also contends that the verdict forms were erroneous.  He says, "The jury was given only two verdict forms for the prior convictions:  one to indicate whether the prior Penal Code section 220 [conviction] was suffered, and one to indicate if the three prior Penal Code section 261 convictions were suffered."  This is not correct.  As we have indicated, there were three verdict forms on the section 261 convictions, allowing the jury to find one, two or three convictions, or to find all the allegations not true.  This alone defeats Granado's contention that the forms did not give the jury any options but to

13.

find all three section 261 convictions true or none of them. Further, any defect in the forms was harmless for the reason we have already stated: There was no rational way for the jury to review the record of the judgment in the rape case and find some but not all of the convictions true.

In his reply brief, Granado belatedly cites section 1158, which states that when multiple prior convictions are alleged, "a separate finding must be made as to each." He says the findings made did not conform to this requirement.

Arguments first made in a reply brief are forfeited. (*People v. Tully* (2012) 54 Cal.4th 952, 1075.) Even if we were to consider the argument, we would reject it, since the three separate forms the jury was given for the rape convictions did in effect require it to make separate findings about each. Finally, any error was harmless under any standard, because, as we have said, in light of the evidence presented, there was no rational way for the jury to find some but not all of the rape priors true.

## V. *Three Strikes Reform Act of 2012*

On November 6, 2012, the voters passed the Three Strikes Reform Act of 2012, Proposition 36, under which a nonserious, nonviolent felony like the simple possession offense at issue here cannot be a third strike triggering a sentence of 25 years to life unless certain findings were made that are not at issue here. (§ 1170.12, subd. (c)(2)(C).) The Act became effective the day after its passage, November 7, 2012. (Prop. 36, § 10, approved Nov. 6, 2012.)[3]

Granado was sentenced on September 28, 2012. He argues that because his case was pending on direct appeal when the new law took effect, it should be applied to him and he must be resentenced. We rejected the same argument in *People v. Yearwood*

---

[3] The full text of the initiative, including uncodified portions such as section 10, is available at <http://vig.cdn.sos.ca.gov/2012/general/pdf/text-proposed-laws-v2.pdf#nameddest=prop36> (as of Apr. __, 2012).

(2013) 213 Cal.App.4th 161 (*Yearwood*). We adhere to that decision, which we will briefly summarize.

In *In re Estrada* (1965) 63 Cal.2d 740, our Supreme Court held that when a statutory amendment reduces the punishment for an offense, the lighter punishment must be applied to cases pending on direct appeal when the amendment takes effect. There is an exception for statutes containing a saving clause. (*Id.* at pp. 745-748.) In *Yearwood*, we held that this exception was applicable to the Three Strikes Reform Act of 2012 because it contains the effective equivalent of a saving clause. (*Yearwood*, *supra*, 213 Cal.App.4th at p. 175.) This equivalent is section 1170.126, which provides that a person "serving an indeterminate term of life imprisonment" for a third strike conviction "may file a petition for a recall of sentence." (*Id.*, subd. (b).)

We interpreted the reference to those "serving" a three strikes sentence to include those sentenced before the Three Strikes Reform Act of 2012 became effective but whose cases were still pending on direct appeal on the effective date. (*Yearwood*, *supra*, 213 Cal.App.4th at p. 175.) We continue to be of the opinion that this provision expresses the voters' intention to apply the sentence-recall scheme, not the new criteria for imposing a three-strikes sentence in the first place, to defendants already serving their sentences on November 7, 2012. This is so even in the case of defendants whose appeals were pending on that date.

Section 1170.126, subdivision (k), is not to the contrary. That provision, stating that the sentence-recall scheme does not abrogate other remedies available to a defendant, protects prisoners from having to choose between using the sentence-recall scheme and pursuing such remedies as a petition for habeas corpus. It does not create a right to retrospective application of the new criteria for a three-strikes sentence. (*Yearwood*, *supra*, 213 Cal.App.4th at p. 178.)

We also held that the rule of lenity does not require the new criteria for a three-strikes sentence to be applied to cases pending on appeal when the law took effect. That

15.

rule requires an *ambiguity* in a statute regarding punishment to be resolved in a defendant's favor. The new law, and in particular the provision of section 1170.126 extending the sentence-recall scheme to persons serving their sentences, is not ambiguous. (*Yearwood*, *supra*, 213 Cal.App.4th at p. 177.)

Finally, we held that declining to apply the new sentencing criteria to defendants sentenced before the law took effect is consistent with the equal protection provisions of the state and federal Constitutions. We stated that requiring prisoners already serving their sentences to use the sentence-recall scheme was rationally related to a legitimate state interest: "It increases the likelihood that prisoners whose sentences are reduced or who are released due to the [Three Strikes Reform] Act [of 2012] will not pose an unreasonable risk of danger to the public." (*Yearwood*, *supra*, 213 Cal.App.4th at p. 179.)

Nothing in Granado's briefs persuades us to depart from these conclusions. The issue is pending before our Supreme Court in *People v. Conley*, review granted August 14, 2013, S211275.

### *DISPOSITION*

The judgment is affirmed.

_____

Kane, Acting P.J.

WE CONCUR:

_____

Poochigian, J.

_____

Franson, J.

16.